Karen S. Burstein, Esq.(KSB-5390)
258 Broadway - Suite 2C
New York, New York 10007
(212) 693-2630
(Attorney for Plaintiff)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
**08 CIV 2515**

---

RAJIV JAIN

                              Plaintiff,

        v.

MARSH INC., MARSH USA, Inc.
and MARSH AND MCLENNAN
COMPANIES, subsidiaries and assignees

                              Defendants.

---

JUDGE GEORGE B. DANIELS
# ECF

VERIFIED COMPLAINT
AND JURY DEMAND

---

Plaintiff Rajiv Jain, by his Attorney, Karen S. Burstein, Esq., for his Complaint against Defendants, alleges the following:

## THE ACTION

1.      This is an action to redress wrongs Plaintiff suffered because of the intentional, continuing and overt race, color and national origin discrimination to which Defendants subjected him; the hostile and harassing work environment created thereby; and Defendants' retaliation against Plaintiff after he lodged formal complaints about the discrimination, first with Defendants' Human Resources Department and then with the Equal Employment Opportunity Commission ("EEOC").

2.      This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII") and the Civil Rights Statutes, 42 USC §§1981, as amended by the Civil Rights Act of 1991 ("CRA"), and the New York Human Rights Law ("HRC") codified in the New York Executive Law §290 *et seq.*

3.      On March 29. 2007, Plaintiff, in compliance with Title VII and the HRC, timely filed a charge with the EEOC, asking that it be simultaneously forwarded to the State and City Human Rights Commissions.. The last known act of discrimination of which Plaintiff complains took place in July of 2007.

4.      On January 31, 2008, at Plaintiff's request, the EEOC issued a Notice of Right to Sue, a

copy of which is attached as Plaintiff's Exhibit 1.  This action has been filed within 90 days of Plaintiff's receipt of that Notice.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the action pursuant to both Title VII and 28 U.S.C. §§ 1331, 1343 and the doctrine of pendent jurisdiction.

6.    Venue lies in this judicial district pursuant to 28 U.S.C. §1391(b) and (c).

## PARTIES

7.    Plaintiff is a non-white male, Indian born United States citizen speaking fluent English with a South Asian accent.  He resides in the City and State of New York.

8.    Upon information and belief, Defendant Marsh Inc. is the world's leading insurance broker and strategic risk advisor. It  has four specialized business units, one of which is Defendant Marsh USA, Inc. with over 28,000 employees. Marsh Inc is a wholly owned subsidiary of Defendant March and McLennan Companies ("MMC"), a global professional services company with more than 58,000 employees worldwide.

9.    On information and belief Marsh Inc, Marsh USA, Inc. and Marsh and McLennan Companies (collectively "Marsh" or "Marsh Defendants") are Delaware corporations whose corporate headquarters and principal places of business are  located at 1166 Avenue of Americas, New York, NY 10036.

## STATEMENT OF FACTS

### *A Concise Outline of  Plaintiff's Extraordinary CV*

10.    As briefly indicated in  paragraph 7 *supra*, Plaintiff  is a dark skinned male,  born in India to  parents of  modest means and limited  education. His first language was Hindi and his accent reflects this, though his English is fluent.

11.    Plaintiff came  to the United States as a teenager on a student visa  in or about 1985. He  received his green card  in  1997 and  then became a an American citizen in 2004.

12.    While working part–time to support himself,   he earned a Bachelor's degree in Electrical Engineering from  Manhattan College in  1989.

13.    Receiving several employment offers upon graduation, he chose Factory Mutual Global ("FM Global" or "FM"), the largest commercial property insurer in the world.  From 1990 until 1992, he worked as an FM Fire Protection Consultant, analyzing the damage potential   from natural

disasters and performing loss control inspections associated with the writing and recovery of insurance premiums.

14.    In 1992, Plaintiff was recruited by Kemper Financial as a Loss Control Engineer, Highly Protected Risk (HPR). As such, he performed more than 100 safety engineering analyses on commercial operations, including light and heavy manufacturing, around the country.

15.    From 1992-1999, Kemper promoted Plaintiff on three occasions, to increasingly more important positions involving the development and oversight of large property accounts worldwide, including the assessment of acquisitions.

16.    While working full time as Account Manager, the youngest in Kemper's history, Plaintiff enrolled at John Jay College where he received an MS in Protection Management (Fire) - honing his analytic and management understanding of risks against which insurance protects.

17.    He also took and passed a number of State and industry examinations to earn a license as a PE (Professional Engineer) and credentials as an ARM (Associate in Risk Management) and CFPS (Certified Fire Protection Specialist).

18.    Anxious to marry his more technical expertise to a broader business management competence, he left Kemper in 1999 to attend, on a merit scholarship, the Simon School of Business at Rochester University, ranked among the country's top 20 MBA programs.

19.    In the summer of 2000, he was picked by The Hartford Financial for its elite Leadership MBA Program. As soon as he completed his MBA in 2001, The Hartford hired him as Assistant Director of its Small Commercial Business Unit.

20.    In 2002, because of his success as Assistant Director in expanding premiums written and clients retained, The Hartford promoted Plaintiff to Director of Marketing, Hartford Reinsurance.

21.    After Hartford Reinsurance was acquired by Endurance Reinsurance in September 2003, Plaintiff returned to FM Global as an Account Manager/Underwriting.

22.    At FM, from 2003 through 2006, Plaintiff managed client, primary broker and reinsurance broker relationships as well as the global property underwriting needs of Fortune 1000 companies. He also trained and mentored new underwriting associates in underwriting standards and global programs.

23.    In 2006, three firms began actively recruiting Plaintiff. He chose to take Defendants' offer to become Vice President and Team Leader in the Property Unit of Marsh USA's Property and International Practice ("PIP").

24.    Marsh's offer was particularly attractive to Plaintiff for two reasons -   career advancement and compensation.

### A  Short Primer on Commercial Property Insurance

25.    There are three main actors in the field of Commercial Property Insurance:

    a.    a corporation or other company (**"client"**) which seeks protection   against risks of damage and loss of various kinds attendant on its operations;

    b.    an **insurer** that **underwrites  ("underwriter")** those risks   through policies paid for by  client premiums; and

    c.    a **broke**r  who  brings the first two parties together.

26.    Generally, the client secures  its insurance contracts from underwriters   through a broker who, ideally, helps the client frame the parameters of its risk management needs and then markets those needs among competing insurers  to secure the most advantageous terms and coverage for that client.

27.    Since the ambit of activity of   brokers is so much larger than that of   underwriters, the former can and do earn considerably more in salary and bonuses than the latter. Underwriters, therefore see brokerage as a career advancement opportunity in commercial property insurance, though, in practice, they rarely actually move into brokerage and almost never at a laterally high level.

28.    Plaintiff's background, however, made him an unusually compelling candidate  for such lateral recruitment. He had greater than customary scientific and forensic understanding of risks; nearly 20 years in the crafting  and maintenance of  insurance policies  in the commercial property arena;  several  advanced degrees in marketing and demonstrated success   in team leadership.

29.    He also had   actual brokerage expertise  and  the requisite professional skill set  because FM's market share is so enormous that, in many instances, it simply dispenses with broker assistance. Consequently, Plaintiff  frequently communicated directly with clients, effectively performing the normal brokerage function of  framing the  initial insurance request, range of coverage and premium possibilities along with  producing the resultant insurance package.

30.    Finally, Plaintiff's underwriting clients at FM Global included major companies of interest to Marsh.

### Marsh's Courtship of Plaintiff

31.    On information  and belief,  just as  Marsh offered Plaintiff an opportunity to advance his career and increase his remuneration by transitioning from underwriting to brokerage, so Plaintiff's diverse  talents, expertise and skills represented added value to Marsh.

32.     Indeed, on information and belief, in order to secure Plaintiff's services in the face of competing bidders, Marsh offered him a signing bonus and a base yearly salary of $180,000, along with eligibility for annual bonuses potentially exceeding $100,000.

33.     The $180,000 base was, on information and belief, substantially more than any other PIP VP-Team Leader, however long-tenured, then earned. The Marsh officer who recruited Plaintiff explained that the proffered salary level comported more with that of a Senior Vice President because Marsh intended to elevate him to that title in the next expected promotion round, several months after Plaintiff started work.

34.     In September, 2006, Plaintiff formally accepted Marsh's offer to join PIP as Vice-President and Team Leader.

35.     His responsibility as Team Leader was to act as primary, high level intermediary between a Fortune Five hundred company needing risk coverage and the insurance carriers who could write the coverage needed. Expected tasks include organizing information collected both by client employees and junior Marsh members into a package reflecting the client's risk management needs and then shopping that package to carriers for bids. Since many of the clients are huge enterprises, they can rarely be insured by a single carrier.

36.     In addition, Team Leaders conduct meetings between clients and insurance carriers to further the bid and acceptance process. Thereafter, during the period between the policy's issuance and its renewal, they represent the client in resolving any confusion or disputes.

### The World of Marsh-Part 1

37.     Marsh is, on information and belief, the world's largest insurance broker, paid millions annually to help clients manage their risks and crises. For many years, as a November 1, 2004 Business Week cover story explained, the Company was "notoriously secret" and "cloistered," which helped keep "any misdeeds under wraps…." In October of 2004, however, the wraps came off when the "New York Attorney General ("AG") charged (MMC's) insurance brokerage with fraud…." (Full article appended as Plaintiff's Exhibit 2)

38.     The Attorney General ("AG") complained that Marsh with engaging in an unlawful scheme to deceive its customers by steering clients' insurance business to favored insurance companies and by soliciting fictitious bids to assure that policies were then actually placed to benefit those favored insurance firms. (*People v Marsh & McLennan,* Index No. *04/403342,* Supreme Ct,

New York County.)[1] On information and belief, the filing of the AG's complaint led Marsh's lenders to demand that its loan and lines of credit be renegotiated.

39.    On January 31, 2005, Marsh settled with the Attorney General. Without admitting or denying the Complaint allegations, Marsh agreed to distribute $850 million over the next four years to those customers who had retained Marsh to place, renew, consult or service insurance where such placement resulted in contingent commissions or overrides.

40.    The settlement also bound Marsh to undertake a number of business reforms including, *inter alia,* the end of contingent commissions; mandated disclosures of all insurance bids and Marsh's compensation related to the placement of a client's business; and company wide promulgation and implementation of ethics and business conduct standards, including employee training in those standards.

41.    The Settlement Agreement between Marsh and the AG contained, as First Appendix, a copy of a written apology to Marsh customers for the shameful "deceit" of those customers by some of its employees. ( Agreement attached as Plaintiff's Exhibit 3).

42.    The inquiry into insurance fee improprieties, which included Marsh's behavior, by the Office of the New York and other State Attorneys General and federal agencies resulted in highly publicized suits against, and substantial monetary settlements with, in addition to Marsh, a number of large insurance companies, including AIG.

43.    Moreover, Marsh itself remains under supervision of the New York AG and Superintendant of Insurance. On information and belief, the last amendment to their settlement was signed in August 2006, a month before Plaintiff began working for Defendants.

44.    Plaintiff was not and had never been a party to any such prohibited arrangements in any of his positions, including underwriting, nor, on information and belief, was FM Global implicated or involved at all in the improper fee and steering scheme that MMC created with other insurers.

`

### *The World of Marsh- Part 2*

45.    The environment Plaintiff entered when he was hired by Marsh Defendants reflected an imperfect integration of the new model of transparency and accountability, precipitated by the above-described litigation, into what had traditionally been a secretive culture of arrogance and high handed disdain for ordinary rules.

---

[1] As part of the Settlement Agreement, attached as Exhibit 3 hereto, this action was discontinued with prejudice.

46.     Moreover, PIP, though on information and belief undergoing major staff changes, was still an hermetic club, rife with rumor mongering and back biting, comprised overwhelmingly of people who had begun their work life at Marsh and reached whatever levels they were then holding through internal promotion.

47.     From his first day, Plaintiff recognized a certain level of tension in the unit. He attributed this largely to the fact that he was the rarest of outsiders – a lateral transferee into brokerage from underwriting, someone with advanced degrees uncommon at Marsh and on the fast track to becoming a senior Vice President.

48.     Moreover, as he later learned from a colleague, Plaintiff's reluctance to gossip and his insistence on respecting the privacy of his peers and subordinates marked him as "too prim and proper" to work at Marsh.

49.     Finally, Plaintiff could not help noticing that he was the sole Team Leader of South Asian nationality and the sole person of color in the title of Vice-President or above in the Unit.

### A Curious and Worrisome Beginning

50.     Within one hour of Plaintiff's arriving for his first day at work on September 27, 2006, his Marsh supervisor took him over to visit Sony Corporation's office, without any instructions about the client's needs or Plaintiff's explicit responsibilities there. Rather, the supervisor simply announced to Sony that Plaintiff would be working on the account.

51.     That event was emblematic of how Defendants treated Plaintiff after the recruitment courtship ended. Essentially, Defendants gave him a position and title and expected him to fill them without coaching, mentoring or advice. He never received the kind of supervisory guidance or orientation training customary for new hires and especially important where someone, like Plaintiff, is brought on from a different field and inserted into a unit of tight-knit insiders.

52.     Indeed, the sole orientation Defendants ever provided Plaintiff consisted of a brief conversation between Plaintiff and someone from Marsh Human Resources about employee benefits, during the second week of Plaintiff's tenure.

53.     This inattention to training and orientation was particularly problematic here, in view both of Plaintiff's visibility as the sole high ranking person of color in the Unit and the fact that his first account assignment, Sony, was, as Plaintiff later discovered, uniformly regarded by his Marsh peers as one of the most difficult to service because its risk manager was famously demanding and critical.

54.     Nonetheless, despite all the above circumstances, including that the initial tension in the Unit never abated, Plaintiff began the job, and continued for many months, confident that Marsh, in part as a consequence of the light shone on it by the Attorney General's litigation, was in active process of changing into a more open, transparent, collegial and inclusive environment.

55.     So, on October 26, 2006, at a company gathering, when another Marsh Vice-President, who, on information and belief, earned less than he, loudly remarked that Plaintiff "would last six months" at best, rather than yield to disquiet, Plaintiff chose to attribute the comment to simple competitive jealousy.

56.     Unfortunately, while the calls on Plaintiff's time and energy grew, his resources shrunk. By late November, 2006, because everyone who had been assigned to most of his accounts (Sony, Carter, Hallmark) had left Marsh, he found himself performing all the tasks normally associated with levels below and above his – from Risk Analyst to Senior Vice President. His pleas to supervisors for relief went unanswered.

### SAB Miller - the Veneer of an Inclusive Marsh Workplace Cracks

57.     Notwithstanding his demanding workload and top management's inattention to his need for additional staff support, Plaintiff was delighted to learn in November, 2006, that he had been chosen to replace the recently resigned Marsh Property Team Leader for SAB Miller, a plum account.

58.     His selection made particular sense to him because he had worked with Miller for three years previously, as an FM Global underwriter.

59.     He was therefore disconcerted by the way William Schneider, Marsh Client Executive for Miller, responded when Plaintiff was initially brought up to meet him. Mr. Schneider never looked directly at Plaintiff, asked any questions about his experience or interests or even made ordinary polite conversation with him. Again, Plaintiff brushed aside his disquiet..

60.     A week later Plaintiff accompanied William Schneider and several Marsh employees to Miller Brewing's headquarters in Milwaukee. There, Mr. Schneider introduced Plaintiff as a new member of the team, but omitted to explain he was the new Team Leader. Again, Plaintiff ignored the slight, because he already knew many in the Miller group and was seamlessly included by them in the substantive conversation about strategy and plans.

61.     When the Marsh contingent returned to the Milwaukee airport, however, Plaintiff was given concrete evidence of the nature of Mr. Schneider's views and animus towards him.

62.    After Mr. Schneider mentioned that his daughter lived in Rochester, Plaintiff took the chance to make a connection with him, enthusiastically opining that Rochester, where he had earned his MBA, was a great town for young people.

63.    Mr. Schneider, looking pointedly into Plaintiff's eyes, in the presence of the entire Marsh team, dismissed Plaintiff's comment with abrupt coldness:  "The only reason you liked it up in Rochester, " he said, " is because there are lot of Indians up there."

64.    The remark stunned Plaintiff, for several reasons.  He had never discussed anything at all about his background or ethnicity with Mr. Schneider and nothing on his resume spoke to the matter.  Moreover, Plaintiff had no idea about the population distribution in Rochester.  Thus, assuming he understood what a "lot of" meant, Plaintiff hade no way even of verifying the factual accuracy of Mr. Schneider's contention.

65.    What was clear and undeniable was the naked racism of the remark and the tone in which it was made – as well as the evident discomfort of the other Marsh employees who heard it.

66.    Again, Plaintiff chose to let the remark pass without contemporary protest, hoping that Mr. Schneider's bigotry would prove an anomaly in the company and its toxicity would be drained of any power because PIP as a whole would act only on Marsh's stated commitment to equal opportunity.

### The Veneer Shatters Entirely

67.    Plaintiff renewed his concentration thereafter on other, concrete obstacles to his performing his job to the peak of his ability. Despite repeated requests, two months into his tenure, he still didn't have the laptop, blackberry and business cards he had ordered the first week in his post. (Indeed, the Blackberry and laptop were only delivered in January and business cards in February, 2007.)

68.    More urgently, he asked, without avail, for personnel resources to service effectively the number of accounts for which he was responsible. (See, paragraph 56 *supra*).

69.    Nonetheless, determined that such obstacles would not prevent success, he persevered in his work with energy, commitment and good humor.

70.    Even when the same co-worker who had predicted Plaintiff wouldn't last six months took pains in December 2006 to tell Plaintiff he was being given all the accounts no-one else wanted (reference was made specifically to Sony), Plaintiff dismissed the comment as another competitive attempt to unsettle him, rather than an accurate, if ill-meant, description of his true status, since Plaintiff was Team Leader for SAB Miller, an undeniably desirable client.

71.    Then, as December drew to a close,  Plaintiff began hearing rumors from other co-workers that he wouldn't have SAB Miller for much longer.

72.    In January, 2007 the rumors were confirmed when Duncan Ellis, the Metro-Zone and North East PIP Practice Leader, informed  him  that Mr. Schneider had instructed  that Plaintiff be removed from the Miller account.

73.    When Plaintiff asked why, Mr. Ellis promised that Mr. Schneider would explain. Though Plaintiff  tried to set up meetings with Mr. Schneider to explore the question, he never succeeded in learning anything from Mr. Schneider because the latter simply never responded to him at all.

74.    However, and worse, during a business conversation in March, 2007 with a former colleague at FM Global, Plaintiff  learned that  Mr. Schneider had  told FM Global management that Plaintiff was removed from the account because the client, Miller, was unhappy with him.

75.    The impropriety of such a communication is patent. Moreover, the contention is belied by reality. In January, 2007, two weeks after Plaintiff was removed  as Team Leader from the Miller account,  he  was assigned to conduct  the marketing meeting for SAB Miller in New York. Subsequent to this event, he was asked to accompany a Miller executive to Bermuda for further marketing meetings.

76.    Given the above, an explanation that Plaintiff's removal was responsive to client demand simply doesn't scan.  Quite simply, if Miller didn't like Plaintiff, why would Marsh intentionally offend its client by letting Plaintiff, without the team leader title, continue as Miller's Marsh intermediary  to insurance carriers.

77.    On the other hand, if the "problem" involved a Marsh executive's concerns about the quality or effectiveness of  Plaintiff's  work for Miller, why didn't Plaintiff's supervisors at Marsh explicitly advise him about this and  demand improvement?

78.    In the end, the only  plausible explanation  for Plaintiff's removal from team leadership at Miller was Schneider's discriminatory animus towards him  -  an animus entirely connected to the fact that he was non-white and of Indian origin.

79.    And the  effect of that discriminatory  animus extended to more than     Plaintiff's presence on  the Miller team.  During the period  he was being moved off the account, despite earlier representations by the   head of PIP about his promotion prospects, he was passed over for advancement.

80.    Instead, three of Plaintiff's VP colleagues in the Property Unit were elevated to Senior Vice President (SVP). Two of them were demonstrably less experienced and educated than he; all were white.

### Milwaukee's Aftermath- Excusing Discrimination by Blaming the Victim

81.    In February, 2007, Plaintiff was unexpectedly called into a meeting with his direct supervisors who announced they were initiating the firm's progressive discipline process. Plaintiff was given a verbal warning that there were problems with his performance; that he had made a woman co-worker cry and that in particular Sony was complaining about the quality of his work.

82.    Since in fact the very woman had a couple of days before stopped by Plaintiff's desk to chat and ask for help, and Sony had sent him a glowing e-mail about the job he'd recently completed, Plaintiff was stunned and sobered.

83.    At this point, he could no longer discount his disquiet about his treatment at Marsh or pretend it was not the inevitable product of a culture strongly biased against the inclusion and progress of people like him –people of color, dark-skinned "foreigners."

84.    Thus, two days after the "verbal warning" meeting detailed in paragraph 81 *supra*, Plaintiff called Defendants' Human Resources Department ("HR") and, reporting all the events described above, asserted violations of Marsh's EEO policies. HR personnel promised to investigate.

85.    When HR did nothing for several weeks, Plaintiff wrote Marsh management to say he was consulting a lawyer and to stress that any company retaliation for exercising his rights to challenge unfair workplace treatment would be as equally impermissible and unlawful as the precipitating acts themselves..

86.    Shortly after he sent the note, he got a message that he would be scheduled for his first appraisal session though there has never been any performance program discussed with him before this date. It would thus have been impossible for him to be rated objectively on how he was doing. In fact, the absence of clearly expressed and agreed upon base-line goals and standards would render an appraisal meaningless except as an impermissible attempt to conceal a possibly abusive employment determinations under a veneer of professional objectivity.

87.    Only after Plaintiff actually hired an attorney who wrote Marsh challenging its failure to follow its own complaint procedures, did HR finally begin the promised investigation. During its pendency, however, Plaintiff's immediate supervisors created intentional and considerable anxiety for him by regularly setting up and then cancelling the so called appraisal sessions.

88.     Moreover, his supervisors increasingly  conveyed an open disrespect for him that eroded confidence in those working with him about his administrative clout  - a problem first created by Schneider's November, 2006 failure to convey Plaintiff's title to Miller.

89.     In fact, that failure  had so confused the client that Miller wrote the  day after the Milwaukee meeting  for clarification of the roles of each of the Marsh team members  - an e-mail answered before  working hours by someone junior to Plaintiff who, unlike him, had mobile communication capacity.  Plaintiff, still waiting for  the Blackberry he had ordered in September, was only able to see the transmission after he came into the office that morning.

90.     This subordinate not only violated his obligation to check with  Plaintiff before responding; his answer claiming that he and Plaintiff were effectively equals on the account explicitly misrepresented Plaintiff's lead position. However, because of the strength of the negative message that Schneider's conduct and words to Plaintiff  at the Miller meeting and the airport in Milwaukee had telegraphed to the team, Plaintiff  was forced to  ask his own supervisors to intervene to clarify his role on the Miller Account  in order  to reaffirm the authority Schneider had put into contention.

91.     When his superiors  learned of this difficulty,  they  did apologize to  Plaintiff and promise they would  make  crystal clear to the whole  Marsh Miller team that Plaintiff was its Property Leader.  Nonetheless, even assuming *arguendo* that this message was actually  delivered, there was  simply insufficient  time to repair the extant damage before Schneider then formally pulled Plaintiff off the  Miller account.

92.     And this damage to Plaintiff's reputation and authority - the strong signal that Marsh management did not have confidence in or respect for his  administrative  capacity and skills - was regularly compounded by  his supervisors' intentional practice, accelerating in  pace after February, 2007, of making staff  assignment  decisions about people working for Plaintiff without prior consultation with or even notice to him  and then  initially communicating the decision only to the affected individual, cautioning the person to say nothing till the managers got around to telling Plaintiff himself.

### *Circling the Wagon – HR  Invents Circumstances to Exonerate Defendants*

93.     In late April of 2007,  HR finally concluded its investigation of the complaint Plaintiff had made in February and informed  Plaintiff that  the Company considered his  concerns  unfounded. In explaining to Plaintiff the  basis of this conclusion, HR offered reasons Plaintiff knew to be factually unsupportable and counter  to reality.

94.    For example, *inter alia*, HR asserted that a subordinate of Plaintiff's, who had been informed of a reassignment by Plaintiff's supervisors without Plaintiff's prior advice, consent or even knowledge, was very excited about the opportunity.

95.    In actuality, however, his subordinate had already confided his unhappiness about the plan to Plaintiff and then proved that unhappiness concretely. Two days after HR's report of the subordinate's purported enthusiasm for reassignment, that individual tendered his resignation from Marsh.

### The Hostility and Harassment Reach Critical Mass

96.    Once HR reported, despite the patent insufficiency, bias and errors of its conclusions, Defendants intensified their negative treatment of Plaintiff. He was given no new accounts, stripped of major responsibilities and then offered a different posting at Marsh which was a demonstrable demotion. As well, he was regularly assigned the kind of tasks which an assistant analyst would normally perform, including, for example, making repeated phone calls to insurers to ask that they put completed policies in the mail to Marsh.

97.    As a result of all of the above, Plaintiff's working environment became increasingly and openly hostile and destructive. Plaintiff , always previously a healthy and even-tempered person, developed stomach problems and deep anxiety for which he had to seek and receive medical and psychological help - treatment that lasted five months.

98.    He also formally filed charges with the EEOC at the end of May, 2007.

99.    In late June, 2007, he was medically advised to take temporary disability leave as a result of the hostile working environment. In early July of 2007, while still on leave and with EEOC charges pending, Plaintiff happened to have a phone conversation with a former colleague at FM Global.

100.    In that conversation, without any warning, the person asked Plaintiff directly if he had sued Marsh. Stunned, and without confirming the fact, Plaintiff inquired about the source of the statement. The individual then responded, in sum and substance, that "everyone at FM Global knew Plaintiff had filed a discrimination charge" against Marsh, adding details that could only have come from Marsh itself, since, apart from his attorney's forwarding a copy of the EEOC statement to opposing counsel, neither she nor Plaintiff had discussed it with anyone at Marsh or FM.

101.    Plaintiff took this information as evidence of continuing animus and unembarrassed retaliatory intent and considered that Marsh had constructively ended his employment. Therefore, on July 16, 2007, he gave Marsh two weeks notice. He was told to leave immediately.

102.    While Defendants paid Plaintiff for those two weeks, on information and belief, out of continuing animus, they willfully and improperly cancelled his medical benefit effective July 16, 2007. Plaintiff only learned about that cancellation much later, when his physician asked him to pay directly for services which the Insurance carrier had rejected for reimbursement on the grounds that Plaintiff was no longer covered by the Marsh policy at that time.

## COUNT ONE

### Discrimination on the Basis of Race, Color and National Origin

103.    Plaintiff repeats the allegations contained in paragraphs 1 through 102 of this Complaint as though fully set forth herein.

104.    Throughout his tenure at Marsh, Plaintiff's race and color and Indian origin were the subject of continuing, damaging comments and actions, singling him out from and disadvantaging him in relation to peers, all of whom were white.

105.    Plaintiff's ability to perform his job as a professional and to be judged only on his completion of financial and advising tasks was compromised and limited because of the tolerance by Defendants for and their encouragement of an atmosphere which focused heavily and negatively on his skin color and origin.

106.    Though the general disrespect and disregard for non-white people did affect other Marsh employees of color, black and Hispanic, largely by frustrating their advancement, Plaintiff was a special target as the sole non-white individual in a high position and the only South Asian Vice-President in the department.

107.    Plaintiff was treated differently and unfairly "on account of race, color and national origin" in derogation of the mandates of federal and state law.

## COUNT TWO

### Race Discrimination in Conditions of Employment

108.    Plaintiff repeats the foregoing allegations of this Complaint as though fully set forth herein.

109.    From the outset, Plaintiff's being "brown" made him an anomaly in Marsh's workplace and the subject of open discussion and often unwelcome attention.

110.    Indeed, early in his tenure, he was called into the office of Duncan Ellis and told that Plaintiff should be "pleased to learn" that the company had hired someone African American to work for him.

111.    Defendants knew or should have known that hiring a non-white underwriter from the outside into the closed world of PIP and at a high level would represent a culture change requiring careful preparation, sensitivity and mentoring.

112.    Instead of finding occasions to support Plaintiff's integration into the unit and the Unit's positive adjustment to a newly diverse environment, Defendants created additional obstacles for Plaintiff to overcome.

113.    Plaintiff's opportunities to perform in his new position at a level consonant with his ability were constrained and polluted by Defendants' intentional singling him out as different; tacitly or openly condoning subtle race baiting on the floor; publicly undercutting his supervisory authority, unconscionably delaying his receipt of essential business tools, including a laptop, Blackberry and business cards; and consistently ignoring his legitimate repeated requests for replacement and additional staff while Defendants were increasing Plaintiff's client portfolio.

114.    Moreover, though better qualified than at least two of the three white candidates advanced to Senior Vice President and though the title's near future availability was an inducement for Plaintiff to choose Marsh's 2006 offer over that of competing firms, Plaintiff was publicly passed over for promotion in 2007, without explanation or notice to him.

115.    By their action and inaction, Defendants violated the rights and protections owed Plaintiff under federal and state law.

## COUNT THREE

### National Origin Harassments and Hostile Environment

116.    Plaintiff repeats the foregoing allegations of this Complaint as though fully set forth herein.

117.    From Plaintiff's first days forward, though Defendants knew or should have known that his appearance and accent would draw attention to Plaintiff's differences in what had been an all white elite group, his integration into the unit was intentionally compromised by Defendants' conduct and attitudes.

118.    In addition to the acts detailed in Count Two above, a high-ranking Marsh officer openly expressed to Plaintiff ,in the hearing of Plaintiff's peers, the prejudiced belief that Plaintiff was only happy in a particular community because there were so many Indians there.

119.    After this event, Defendant intentionally sought to make Plaintiff's functioning more difficult and unsettled, by calling him for and then cancelling numerous appraisal meetings and

regularly undercutting his authority over his staff by excluding him from participation in decisions about staff deployment.

120.    This dramatically discriminatory and dismissive workplace atmosphere, the direct and subtle signals from his bosses and the deliberate removal of Plaintiff as conduit to his own supervisees, associated with his national origin and race, created an intolerably hostile environment in violation of Plaintiff's rights and protections under federal and state law.

## COUNT FOUR

### Retaliatory Constructive Termination

121.    Plaintiff repeats the foregoing allegations of this Complaint as though fully set forth herein.

122.    Defendants responded to Plaintiff's lawful insistence on reporting discriminatory conduct, resisting his denigration by colleagues and managers, documenting his mistreatment and filing with the EEOC by acts which further undermined his status in the unit and diminished his managerial authority, including by ignoring his input on staff decisions; publicly removing him from accounts and referring no new ones; commenting negatively about his performance to his former employer; and impermissibly reporting the EEOC charges to others in the industry.

123.    This conduct was in derogations of the rights and the protections owed Plaintiff under federal and state law.

## COUNT FIVE

### Retaliatory Interference with Contract and Due Process Interests

124.    Plaintiff repeats the foregoing allegations of this Complaint as though fully set forth herein.

125.    Defendants know or should have known that their retaliatory disclosure about Plaintiff's relationship with Marsh and Marsh clients necessarily constrained and harmed Plaintiff's future career opportunities.

126.    First, at least for the next four or five years, Plaintiff will not be able to work in the United States as commercial property broker since Marsh dominates the field, it has spoken improperly negatively about him to industry firms, and Plaintiff initially chose Marsh over its largest competitor in 2006.

127.    Second, while Plaintiff was quickly hired by another company as an Underwriter, he necessarily took a cut in salary and benefits which loss will be compounded by time's passage.

128.    Marsh's discriminatory and retaliatory conduct has therefore impermissibly interfered with Plaintiff's protected property and liberty interests in derogation of federal law and the United States Constitution.

**WHEREFORE**, Plaintiff requests an order, judgment and award against Defendants as follows:

a.  Compensatory damages for lost wages in the form of back and front pay, of $600,000 ;

b.  Direct and compensatory damages for medical and psychological expenses and for pain and suffering in an amount to be determined;

c.  Punitive damages of $3,000,000, including for intentional discrimination under §1981a;

d.  costs, including reasonable attorney's fees and disbursements; and

e.  such other and further relief as the Court may deem just and proper.

<u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury.

Dated: March 12, 2008
   New York, New York

Respectfully submitted.

Karen S. Burstein, Esq.(KSB-5390)
258 Broadway - Suite 2C
New York, New York 10007
(212) 693-2630
Attorney for Plaintiff

17

**VERFICATION**

County of New York )
                          ) ss.:
State of New York     )


RAJIV JAIN, being duly sworn, deposes and says:

 I am the Plaintiff in the foregoing Verified Complaint. I have read the particulars of that Verified

Complaint and the contents are true to my knowledge except  as to the matters alleged on information

and belief and matters in the nature of legal averments or conclusions and inferences; and as to any

matters alleged on information and belief, I believe them to be true from my own knowledge and

review of all documents.

_____
RAJIV JAIN


Subscribed and sworn to before me
this 12th  day of March, 2008

_____
          Notary Public

KAREN S. BURSTEIN
NOTARY PUBLIC - STATE OF NEW YORK
NO. 02BU6144577
QUALIFIED IN NEW YORK COUNTY
MY COMMISSION EXPIRES APRIL 24, 2010

18

Karen S.  Burstein, Esq.(KSB-5390)
258 Broadway - Suite 2C
New York, New York 10007
(212) 693-2630
(Attorney for Plaintiff)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
**08  CIV  2515**

RAJIV JAIN

                Plaintiff,

      v.

MARSH INC., MARSH USA, Inc.
And MARSH AND MCLENNAN
COMPANIES,  subsidiaries and assignees

             Defendants.

JUDGE GEORGE B. DANIELS

**ECF**

VERFIFIED COMPLAINT
AND JURY DEMAND

# EXHIBIT 1 TO COMPLAINT

EEOC Form 161-B (10/96)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

---

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

---

| | |
|---|---|
| To: Rajiv Jain<br>360 West 43rd Street Apt. 19C<br>New York, NY 10036 | From: Equal Employment Opportunity Commission<br>New York District Office<br>33 Whitehall Street, 5th Floor<br>New York, New York 10004-2112 |

| | *On behalf of person(s) aggrieved whose identity is* |
|---|---|
| [     ] | *CONFIDENTIAL (29 CFR § 1601.7(a))* |

---

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520 - 2007 - 02976 | Katherine Greenfield | (212) 336 - 3762 |

*(See also the additional information attached to this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[ **X** ]   More than 180 days have passed since the filing of this charge.

[     ]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[     ]   The EEOC is terminating its processing of this charge.

[     ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[     ]   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[     ]   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Spencer H. Lewis, Jr.*

Spencer H. Lewis, Jr., District Director

1|31|08

*(Date Mailed)*

Enclosure(s)

| cc: Respondent(s):<br>CP's Attorney<br>Karen S. Burnstein<br>258 Broadway, Suite 2C<br>New York, NY 10007 | William M. Sunkel<br>Winston & Strawn LLP<br>200 Park Avenue<br>New York, NY 10166 | Marsh, Inc.<br>1166 Avenue of the Americas<br>New York, NY 10036 |
|---|---|---|

Karen S. Burstein, Esq.(KSB-5390)
258 Broadway - Suite 2C
New York, New York 10007
(212) 693-2630
(Attorney for Plaintiff)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
**08 CIV 2515**

| | |
|---|---|
| RAJIV JAIN | JUDGE GEORGE B. DANIELS |
| Plaintiff, | **ECF** |
| v. | VERFIFIED COMPLAINT<br>AND JURY DEMAND |
| MARSH INC., MARSH USA, Inc.<br>And MARSH AND MCLENNAN<br>COMPANIES,  subsidiaries and assignees | |
| Defendants. | |

# EXHIBIT  2 TO COMPLAINT



BW MALL SPONSORED LINKS

► Close Window

**BusinessWeek**

NOVEMBER 1, 2004

COVER STORY

# The Secret World Of Marsh Mac

**CEO Jeff Greenberg presides over the arrogant and tight-lipped culture of Marsh & McLennan, where conflicts of interest abound. There's more trouble coming for the world's largest insurance broker.**

When Jeffrey W. Greenberg took the helm of notoriously secretive Marsh & McLennan Cos. (MMC), a $12 billion financial-services company, on Nov. 18, 1999, analysts were happily buzzing that Greenberg was a gregarious, outgoing executive. The word on Wall Street was that he would raise the profile of Marsh Mac with more public appearances and open communication than his tightlipped predecessor, A.J.C. "Ian" Smith.

They couldn't have been more wrong. In the past four years, Greenberg sightings have been scarce. The company, true to its secretive history, became even more cloistered. But on Oct. 14, Marsh & McLennan was forced into a harsh public spotlight when New York Attorney General Eliot Spitzer charged its insurance brokerage with fraud. In a civil complaint filed in New York State Supreme Court, Spitzer alleges that the company engaged in bid-rigging, price-fixing, and accepting payoffs from insurance companies.

Marsh & McLennan, the world's largest insurance broker, is paid millions annually to manage clients' risks and crises. Now it's having epic problems of the same nature itself. In a three-month investigation, *BusinessWeek* spoke with some 50 former and current MMC employees, insurance industry executives, and investigators -- and discovered that the firm's problems may well go far beyond Spitzer's initial charges.

has learned that MMC and its executives could face a raft of further legal and regulatory problems. Spitzer's office is mulling criminal charges against several execs connected with the insurance brokering scandal. It is also looking into whether Mercer, MMC's pension-consulting arm, and Putnam Investments, MMC's mutual-fund company, push clients into buying Marsh insurance products. As part of an industrywide sweep, the Securities & Exchange Commission is probing Mercer's alleged "pay to play" practices of requiring payoffs from money managers who want it to recommend them to pension clients. At the same time regulators are examining payments Putnam and other mutual-fund outfits make to companies to ensure that their funds are featured in corporate 401(k) plans.

As if that's not enough, several class actions have sprung up -- at least one regarding the alleged fraud at Marsh Inc., as the insurance brokerage is known, and others involving Putnam. Already, the legal onslaught is taking a toll. On Oct. 19, Moody's Investors Service downgraded the firm's debt, citing concerns about "financial consequences" arising from Spitzer's lawsuit. And fear that some of MMC's revenue streams could dry up has knocked down its share price. In the four trading days following Spitzer's Oct. 14 announcement, the stock plummeted 48%, wiping out $11.5 billion in market cap.

At the center of the storm stands Jeff Greenberg, 53. If you ask almost anyone about him, you'll hear that he is smart as a whip, incredibly knowledgeable about the insurance business, well-spoken, and polished. Much like his father, Maurice R. "Hank" Greenberg, 79, the legendarily hard-charging chairman and CEO of insurer American International Group Inc. (AIG), he has a history of being opportunistic when it comes to scoring profits for his company. Even now, his defenders insist that he inherited serious problems, particularly in the brokerage and mutual funds businesses, when he moved into the top slot.

Yet Greenberg has been slow to tackle the problems and reluctant to change the arrogant culture in which they festered. His company has a business model of aggressively cross-selling the products of its various divisions, which, say former and current employees and investigators, can lead to serious conflicts of interest. The potential for new conflicts rose as Greenberg pursued a policy of growth by acquisition. Add the tough financial goals that Greenberg sets for senior managers, and the pressure to bend the rules grows. An MMC spokeswoman disagrees: "MMC has historically served clients with a wide array of services and products. We find if we serve clients well, financial goals are met."

The firm's obsessive focus on secrecy helps keep any misdeeds under wraps, say the sources. "Some companies have a culture based on kickbacks and undisclosed financial arrangements, and their people are forced to remain silent about wrongdoing," says Edward A.H. Siedle, a former Putnam compliance director and SEC official who now heads the Center for Investment Management Investigations in Ocean Ridge, Fla., which looks into pension fraud.

Why didn't Greenberg act more promptly? Some critics say he seems deaf to the swelling chorus of demands from regulators and the public for higher standards of behavior in the financial-services industry. In the early days of Spitzer's investigations, Greenberg dispatched General Counsel William L. Rosoff to meet the Attorney General. Rosoff behaved like a pit bull, says one attendee, and infuriated Spitzer with condescending remarks. "The leadership of that company is not a leadership I will talk to," Spitzer said later.

Several former top MMC honchos blame Greenberg's executive style. They say he is an indecisive leader and somewhat detached. He is a hands-off manager -- as long as his staff make their numbers. Says one employee: "It's the kind of place where if you don't meet or exceed a goal, heads roll." Typically, Greenberg favors domineering division heads and gives them free rein -- until a problem occurs. Then he is quick to oust them. MMC says: "Greenberg's record in management changes and actions to resolve problems demonstrate the opposite."

The day after Spitzer announced his charges, MMC's board expressed full confidence in the CEO. That's no surprise: Greenberg chairs the board, which Nell Minow, editor and corporate governance expert at the Corporate Library, says is fiercely loyal and "rife with cronyism." Six of its 16 members are directly involved in running Marsh Mac or one of its subsidiaries, says Glass Lewis & Co., a San Francisco proxy-research firm.

The board may be compelled to take action against top execs if enforcers now circling the company are able to force fundamental changes in the way it does business. Analysts and other experts say that could damage the company's financial health. "If you eliminate all the questionable payments at Marsh & McLennan, you eliminate half of their profits," says a former executive. Spitzer's complaint says contingent commissions -- lucrative payments Marsh receives for steering unsuspecting clients to certain insurers -- alone amount to $800 million a year, or about half the insurance brokers' 2003 net income. Says Ronald W. Frank, a Smith Barney (C) analyst: "One of the risks to Marsh isn't just possible fines but the fact that a significant component of its compensation is being brought into question."

*BusinessWeek* requested several interviews with Greenberg but was repeatedly told: "Mr. Greenberg does not speak to the press." Understandably, companies are reluctant to comment on ongoing investigations. A company spokeswoman says, "Marsh & McLennan is a company that neither condones nor tolerates wrongdoing and takes forceful action when such issues arise." The company said it has voluntarily suspended the contingent fee payments. Until the latest scandal, Greenberg and others in the industry have staunchly defended the fees. They say brokers go beyond the call of duty for their clients, by, for example, creating custom policies or collecting premiums. On a July conference call with analysts, Greenberg said: "We provide services for which we expect compensation. We don't spend a lot of time worrying about it."

## "Throwing the Quote"

Perhaps William Gilman, Marsh Global Broking's executive director of marketing and a managing director, was doing the worrying. Gilman, in his 60s, is a larger-than-life character who some call Kill Bill, after the Quentin Tarantino movies. The nickname could also have something to do with an internal AIG memo about bidding for business that was an exhibit in the Spitzer case: "Per W. Gilman -- get to right number [regarding a bid] or 'we'll kill you.'" Says a former colleague: "He's the kind of guy who stubs a cigarette out in your coffee cup."

Gilman, says Spitzer's complaints, strictly enforced the system of rigged bids and payoffs from insurers. He also rated insurers by how much they paid Marsh in contingent commissions. A September, 2003, e-mail from his office released by Spitzer reads: "We need to place our business in 2004 with those that...pay us the most." A source close to the investigation told *BusinessWeek* that Gilman will likely face criminal charges. Gilman did not return several calls. On Oct. 19, MMC suspended Gilman and four others.

Folks dealing with Marsh were supposed to abide by "Billy's Rules" -- a playbook Gilman devised for insurers, according to someone familiar with the company. The rules were: 1) No "no's" (meaning Gilman should never be told "no" by an insurer); 2) If Marsh doesn't get the deal stupid, we will broom your ass. 4) Never think you own your business, you only rent your business. Marsh owns your business. "Billy's Rules," emblazoned on an office plaque, hung in Gilman's office.

Gilman, according to the complaint, oversaw Marsh's "throwing-the-quote" scheme, whereby some insurers were told to quote artificially high bids for business. Several times, Gilman refused to allow AIG to relay competitive bids to clients, according to Spitzer's complaint, warning AIG that "it would lose its entire book of business with Marsh" if it didn't provide higher price quotes than the insurer Marsh favored. The phony quotes were often referred to as "throwaway quotes," "protective quotes," "backup quotes," or "B quotes," says the complaint. In return, according to Spitzer, Marsh protected AIG and other firms that played ball when it was their turn to win. AIG declined to comment.

Gilman also staged what he called "drive-bys" -- in which insurers were asked to attend presentations for prospective clients even when they knew they had no chance of snagging the deal, according to Spitzer. A regional manager for Munich-American RiskPartners, a division of American Reinsurance, who was so frustrated by constant requests from Marsh for "live bodies" to attend drive-bys that he wrote in an all-caps e-mail: "We don't have the staff to attend meetings just for the sake of being a body. While you may need a live body, we need a live opportunity."

Gilman may have enjoyed such power because Marsh already dominated insurance brokering. By the late '90s, Marsh had cornered 40% of the global business thanks to aggressive acquisitions. Marsh's grip tightened when it centralized control of broking activities in New York. Analysts say Marsh's dominance allows it to control pricing, the way insurance products are structured, and how premiums and payouts are disbursed. "They have both their clients and insurers by the *cojones*," says a competitor.

But now it's MMC's top brass who are squirming. Being in the spotlight is highly uncomfortable for MMC -- long known as a patrician, white-shoe firm with an air so understated and secretive that at least one former exec likened it to working at the CIA. Its ranks have included Ambassador L. Paul Bremer III, former Presidential Envoy to Iraq, who recently ran RMC's crisis-consulting business; Stephen Friedman, President George W. Bush's top economic adviser and former Goldman, Sachs & Co. (**GS** ) co-chairman, who was an MMC senior principal; Craig Stapleton, the husband of George W. Bush's cousin Dorothy, who was an MMC president; and Lord Lang of Monkton, a former British Member of Parliament who still sits on the board. Many Marsh and Putnam execs summer by the sea in ultra-wealthy and clubby Watch Hill, R.I.

## "I'd Love to Talk...But"

MMC certainly goes to extraordinary lengths to ensure loyalty. A former Putnam executive recalls being grilled by a company psychiatrist in a hotel room for hours during a job interview. Says the former exec: "Everyone has a Dr. [James] Terry story. He would ask questions like: 'What's the worst thing that ever happened to you?' 'What are your views on religion?' 'Who do you vote for?' They tell you they're looking for any signs of malfeasance or criminality. But they're also looking for people who will fit in, lockstep, at the company." An MMC spokeswoman claims that using a psychiatrist for screening purposes is "industry practice." Terry could not be reached for comment.

Once they're in, most people who join MMC's upper echelons must sign binding noncompete agreements, say both current and former employees. "Each time you exercise stock options, you have to sign a new one," says one former exec. MMC calls this, "a generally accepted practice." Employees who leave MMC and then disparage it in public risk losing any deferred compensation to which they are entitled. One former MMC exec told *BusinessWeek:* "Gee, I'd love to talk to you. There's a lot to say. But they've got my money."

Since moving to rival broker Willis Group Holdings Ltd. (**WSH** ), a former Marsh exec says he has been spied on by a private investigator who he suspects was Kroll Inc., which MMC bought in July for $1.9 billion. He says he believes MMC wants to ensure that former employees are not using its proprietary information. MMC would not comment without specific details. Another former exec says MMC constantly monitored internal phone calls. MMC says it is unaware of this.

At the start of 2004, insiders say, MMC managers were forced to sign new noncompete agreements. At least two longtime MMC execs left as a result, they say. "The feeling was, I've never disparaged the company and I've been loyal all these years. And you're making me sign another one of these?" says one.

The changes, say former execs, were designed to stem a rising tide of defections by its brokers to smaller rivals who they say treat clients more fairly. Over the past year, MMC has been embroiled in a nasty lawsuit with Palmer & Cay, a Savannah (Ga.) insurance broker whose president, James B. Meathe, is Marsh's former Midwest chief. In documents filed in Michigan's Wayne County Circuit Court in September, 2003, MMC alleged that P&C set out to induce some 70 "key Marsh employees to resign" and "violate their noncompete agreements" to join P&C, which P&C denied. Robert Cleary, a lawyer representing P&C declined comment. Sources familiar with the suit say Marsh has used tough tactics, with one Marsh board member telling P&C: "We're going to bury you." MMC declined comment.

Such behavior seems at odds with Greenberg's impeccable pedigree. After graduating from upper-crust Connecticut boarding school Choate, Greenberg headed to Brown University, where he graduated with honors. He then earned a J.D. degree at Georgetown University's law school. Greenberg sits on a number of prestigious nonprofit boards, including the New York Stock Exchange. He's a trustee of the Brookings Institution and a member of the Trilateral Commission -- an organization David Rockefeller founded in 1973 that consists of the world's top political and business leaders.

He and his second wife Kimberly have four children. According to friends, they lead a relatively quiet Manhattan life with little of the ostentation that often accompanies the CEO lifestyle despite the $22 million Greenberg took home last year. The family has a spacious but understated apartment on Park Avenue and a weekend house in Lakeville, Conn. With his tall and muscular physique, friends say, he plays a mean game of tennis. Steven Rattner, managing principal at private investment firm Quadrangle Group LLC who serves as a Brown trustee with Greenberg, says: "Jeff's a real stand-up guy. He's thoughtful, committed, and always does what he says he's going to do." Veteran journalist Nikki Finke, who was married to Greenberg in the early 1980s, says he was never a spoiled rich kid. During high school he pumped gas and cleaned boats.

And despite the unfolding scandals, most industry players still seem to respect Greenberg. He certainly got high marks in his early days as MMC CEO for his handling of the aftermath of the September 11 World Trade Center attacks. Three years earlier, Marsh had leased floors 93 to 100 in Tower One, and 294 MMC employees -- mostly salesmen, secretaries, and analysts in their 20s and 30s -- lost their lives when the first airplane hit. At services, Greenberg spoke movingly about the makeshift memorial that had occupied an entire wall next to the cafeteria at MMC's Sixth Avenue headquarters.

## After Andrew

Still, just days after September 11, Greenberg and top MMC execs met to figure out how to profit from the disaster. They formed a subsidiary -- Axis Specialty Ltd. -- to sell insurance to corporate customers at three or four times the rates before September 11. MMC says that it was merely "meeting market demands."

For some industry players the move recalled what Greenberg did in 1992 after Hurricane Andrew slammed into South Florida and wiped out some $15 billion worth of property. Jeff, who was working for dad at AIG, sent out an internal memo stating: "This is an opportunity to get price increases now." It was leaked to the press, which had a field day -- with one newspaper branding him "a vulture." The memo moved Ralph Nader to complain and Florida regulators to freeze rates. People close to Jeff say he was humiliated by the incident. "That's a major reason why he avoids the press these days," says one.

Greenberg's ambition has been fueled by father Hank. Says ex-wife Finke: "Jeff was always terrified of his father. He was deeply insecure and wanted his approval." "Hammerin' Hank" is known for his cantankerous, rough-and-tumble demeanor. "Hank was known for calling up his lieutenants on weekends and holidays and bawling them out," says a former executive.

When Jeff was working under his father in the early '90s, heading up AIG's domestic brokerage group, Marsh sources say Hank raked him over the coals at a meeting in front of top executives. Hank, they say, had ordered Jeff to deal with a personnel issue, but Jeff had dragged his feet. Says one: "Hank started yelling at Jeff in front of everyone: 'You either fix your management problem, or I'll fix mine!'" But the *coup de grace* came in 1995 when Hank abruptly promoted Jeff's younger, less experienced brother Evan, making them equals in AIG's hierarchy. Two weeks later, Jeff left.

Evan, 49, is a college dropout and nonconformist who, by his own admission, had a bit of a troubled youth. But he had a knack for the insurance business and rose quickly at AIG. Unlike Jeff, Evan is one of the few people who stand up to his father. "Evan's scrappy -- a yeller," says an insurance industry veteran. "I think Hank could somehow relate to him better than Jeff." But in 2000, Evan also resigned from AIG. He now heads Ace Ltd. (**ACE** ), a Bermuda company named in Spitzer's complaint -- along with AIG -- as one of those involved in Marsh's alleged bid-rigging and price-fixing schemes.

Months after exiting AIG, Jeff landed at Marsh & McLennan, where he had worked as a broker in the mid-'70s. As a partner in MMC Capital, the firm's risk-capital unit, he excelled at building MMC's Trident Funds, which invested billions in various insurance entities and real estate, and hoisted himself onto the fast track. He was determined "to show up his dad and brother," says a source familiar with the industry.

At Marsh Mac, Jeff was able to take advantage of the Greenberg name: Then-CEO and Chairman Smith -- an old acquaintance of Hank's -- was Jeff's personal mentor. Jeff was named chairman and chief executive of MMC Capital in 1996. By the beginning of 1999, he had been promoted to president of Marsh & McClennan. And by the end of that year, he was CEO. He was elected chairman in May, 2000.

Even if Greenberg did inherit the Marsh Mac mess, he's under fire for how he handled it. "Despite seeming like a hero for ousting [former Putnam CEO Lawrence J. ] Lasser and moving toward cleaning up Putnam, the truth is, Greenberg didn't address things until he absolutely had to," says a former colleague. In November, 2003, after Putnam was slapped with a securities-fraud charge, longtime CEO Lasser, 61, was forced to resign. Regulators alleged that company brass had been aware of illegal trading in Putnam funds since 2000.

Problem was, the autocratic Lasser had already built an empire that accounted for half of MMC's revenues when Greenberg took over. "Lasser basically created his own little fiefdom and allowed no one in," says Mercer E. Bullard, president and founder of Fund Democracy, an advocacy group, and a securities law professor at the University of Mississippi. But after the 2000 market crash, some MMC execs say Greenberg should have swooped in and taken control. Says a former Putnam exec: "[Jeff's] delaying tactic cost Putnam its reputation." Insiders say Charles E. Haldeman, who took over as Putnam's CEO last November, was angry at Greenberg for dragging his feet. Haldeman declined to comment.

**A Frustrating Process**
In the past year, Putnam has lost some $70 billion in assets. Recently, several pension funds, including CalPERS, the California Public Employees' Retirement System, agreed to let Putnam compete for its business, but with stipulations: Putnam must consider pruning executive pay and ramp up financial disclosure. "That's a huge positive move for corporate governance," says Minow.

But governance gurus still aren't happy with MMC or Greenberg. The Corporate Library says the company still awards its execs excessive compensation. In 2003 it paid an aggregate $60 million to its top five officers, vs. an average $21 million at other large financial companies, according to Glass Lewis. MMC says: "Our independent directors and outside consultants set compensation." This past year, several large pension funds joined forces to propel an independent director, Zachary W. Carter, a lawyer, onto the board. Richard Ferlauto, director of pension and benefit policy at the American Federation of State, County & Municipal Employees, says it was a slow-moving and frustrating process: "Jeff thought he knew what was right, and he wasn't going to let anyone rock the boat." Carter didn't respond to numerous interview requests.

Earlier this year Greenberg asked mentor Smith, 69, to come out of retirement to help him. Insiders say Greenberg was intimidated by Lasser and needed Smith to negotiate with the former Putnam CEO. Smith, who has an office close to Greenberg's, was named chairman of Putnam. Greenberg also promoted Steven Spiegel, Lasser's right-hand man, to vice-chairman of Putnam. Says Bullard:"Although Haldeman has taken control and is doing a great job, it doesn't change the fact that a lot of bad stuff happened under Smith and Spiegel."

Some of the bad stuff may have had to do with Putnam funds being pushed by Mercer, Marsh Mac's pension-consulting arm. Mercer was long considered a sleepy, less profitable outpost of the Marsh kingdom. Then, say insiders, in the mid-'90s it came under pressure to turn bigger profits. That's when it started offering pricey conferences for money managers at $50,000 to $60,000 a pop. "If you don't attend those, it's nearly impossible to get on Mercer's list to manage pension money," says Jack Silver, a former trustee at Chicago's teachers' pension fund. MMC denies this. The SEC is investigating these allegations. And Spitzer will likely look into whether Putnam pushes Marsh-brokered variable annuity products onto investors. "There's no disclosure about this conflict to Putnam clients," says Selva Ozelli, a securities lawyer close to the investigation. There could also be an investigation into how Marsh, allegedly slow to pay out premiums, profits from the float.

That means deepening troubles for Greenberg, who some critics say has done far too little to shore up MMC's reputation over the past year. "Print it, post it, and pray -- it seems as if that's all Greenberg's done when it comes to ethics," says Patrick McGurn, special counsel at Institutional Shareholder Services Inc., a corporate governance consultant. Until now, say analysts, Greenberg's main focus has been on acquiring more companies. Now he's forced to deal with spreading legal woes and a public-relations nightmare. Says David D. Brown IV, Spitzer's investment protection chief: "We're really just at the beginning here. We're pursuing a number of leads and will follow them where they take us."

In an Oct. 15 press release Greenberg announced that MMC was appointing a private investigator to look into the alleged insurance broker fraud. It's a move some might have applauded, except for one thing: He gave the job to the head of MMC's Kroll -- who's now the head of Marsh.

By Marcia Vickers

Advertising | Special Sections | MarketPlace | Knowledge Centers

Terms of Use | Privacy Notice | Ethics Code | Contact Us

The McGraw·Hill Companies

Xerox Color. It makes business sense.

Copyright 2000- 2008 by The McGraw-Hill Companies Inc.
All rights reserved.

Karen S. Burstein, Esq.(KSB-5390)
258 Broadway - Suite 2C
New York, New York 10007
(212) 693-2630
(Attorney for Plaintiff)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
**08 CIV 2515**

| | |
|---|---|
| RAJIV JAIN<br><br>Plaintiff,<br><br>v.<br><br>MARSH INC., MARSH USA, Inc.<br>And MARSH AND MCLENNAN<br>COMPANIES, subsidiaries and assignees<br><br>Defendants. | JUDGE GEORGE B. DANIELS<br><br>**ECF**<br><br>VERFIFIED COMPLAINT<br>AND JURY DEMAND |

# EXHIBIT 3 TO COMPLAINT

**Agreement Between the Attorney General of the State of New York and
the Superintendent of Insurance of the State of New York, and
Marsh & McLennan Companies, Inc. , Marsh Inc. and their subsidiaries and affiliates
(collectively "Marsh") dated January 30, 2005**

WHEREAS, the New York Attorney General (the "Attorney General")

commenced an action against Marsh & McLennan Companies, Inc. and Marsh Inc. pursuant to

Executive Law § 63 (12), the Donnelly Act (Gen. Bus. Law § 340 *et seq.*), the Martin Act (Gen.

Bus. Law § 352-c) and the common law of the State of New York dated October 14, 2004 (the

"Complaint"), and has conducted an investigation related thereto (the "Attorney General's

Investigation");

WHEREAS, the Superintendent of Insurance of the State of New York (the

"Superintendent") issued a Citation to Marsh & McLennan Companies, Inc. and certain of its

subsidiaries dated October 21, 2004 and an Amended Citation dated October 25, 2004

(collectively, the "Amended Citation") pursuant to § 2110 of the Insurance Law, and has

conducted an investigation related thereto (the "Superintendent's Investigation");

WHEREAS, the Attorney General and Superintendent have alleged that Marsh

unlawfully deceived its clients by a) steering clients' insurance business to favored insurance

companies, and b) soliciting fictitious bids in order to assure that insurance policies were placed

to benefit favored insurers, as alleged in the Complaint;

WHEREAS, Marsh is cooperating with the Attorney General and

Superintendent's Investigations;

WHEREAS, in the wake of the filing of the Complaint and the Amended Citation,

Marsh has adopted, and under this Agreement (the "Agreement"), will continue to adopt, a

1

number of business reforms that will govern the conduct of Marsh's employees;

WHEREAS, the Attorney General, the Superintendent and Marsh wish to enter into this Agreement to resolve all issues related to Marsh raised in the Complaint and the Amended Citation;

WHEREAS, the Attorney General and Superintendent find the relief and agreements contained in this Agreement appropriate and in the public interest;

WHEREAS, this Agreement is entered into solely for the purpose of resolving the Complaint and Amended Citation, and is not intended to be used for any other purpose;

WHEREAS, without admitting or denying any claim in the Complaint or the assertions in the Amended Citation, Marsh is entering into this Agreement prior to any court making any findings of fact or conclusions of law pursuant to any allegations by the Attorney General or the Superintendent;

WHEREAS, neither this Agreement, nor any acts performed nor documents executed in furtherance of this Agreement, may be used as an admission of the allegations and claims contained in the Complaint and the Amended Citation;

NOW THEREFORE, Marsh, the Attorney General and the Superintendent hereby enter into this Agreement, with a statement of apology attached as Exhibit 1, and agree as follows:

## MONETARY RELIEF

1.      Marsh shall pay Eight Hundred Fifty Million Dollars ($850,000,000) into a fund (the "Fund") over the next four years in four annual payments to be paid to Marsh's policyholder clients who retained Marsh to place, renew, consult on or service insurance where such placement resulted in contingent commissions or overrides.  All of the money paid into the Fund and any interest earned thereon shall be paid to such policyholder clients pursuant to this Agreement.  No portion of the Fund shall be considered a fine or a penalty.  This sum is in full satisfaction of Marsh's obligations hereunder, and neither the Attorney General nor the Superintendent shall seek to impose on Marsh any other financial obligation or liability related to the Complaint or the Amended Citation.

2.      Marsh shall A) by April 30, 2005 calculate, in accordance with a formula approved by the Attorney General, the amount of money each of the U.S. policyholder clients who retained Marsh to place, renew, consult on or service insurance with inception or renewal dates between January 1, 2001 through December 31, 2004 where such placement, renewal, consultation or servicing resulted in contingent commissions or overrides recorded by Marsh between January 1, 2001 through December 31, 2004 (the "Relevant Period") is eligible to receive; B) within ten (10) days of completing these calculations, file a report with the Attorney General and the Superintendent, certified by an officer of Marsh, setting forth:    I) each client's name and address; ii) the client's insurer(s), product line(s) and policy(ies) purchased and policy number(s); iii) the amount the client paid in premiums or consulting fees for each such policy; iv) for each such policy, the amount of contingent commission or override revenue recorded by Marsh during the Relevant Period attributable to that policy, in accordance with a calculation approved by the Attorney General and

3

the Superintendent; and v) the amount of contingent commission or override revenue each client is eligible to receive for each such policy and in the aggregate for all such policies pursuant to this Agreement; and C) by May 20, 2005, send a notice, subject to the approval of the Attorney General and the Superintendent, to each client eligible to be paid from the Fund, setting forth items ii) through v), above, and stating that the amount paid may increase if there is less than full participation by eligible clients in the Fund.   For the purposes of this paragraph, "U.S. policyholder clients" means U.S.-domiciled policyholder clients and policyholder clients who retained Marsh's U.S. offices to place, renew, consult on or service insurance.

3.           Clients eligible to receive a distribution from the Fund shall have until September 20, 2005 to request a distribution.  Eligible clients who voluntarily elect to receive a cash distribution (the "Participating Policyholders") shall tender a release in the form attached hereto as Exhibit 2. In the event that any eligible client elects not to participate or otherwise does not respond (the "Non-Participating Policyholders"), that client's allocated share may be used by Marsh to satisfy any pending or other claims asserted by policyholders relating to these matters.  In no event shall a distribution be made from the Fund to any Non-Participating Policyholder until all Participating Policyholders have been paid the full aggregate amount due as calculated pursuant to ¶ 2 above; nor shall the total payments from the Fund to any Non-participating Policyholder exceed 80% of that Non-participating Policyholder's original allocated share.  If any funds remain in the fund as of June 20, 2008, any such funds shall be distributed on a pro rata basis to the Participating Policyholders.

4.           In no event shall any of the funds in the Fund be used to pay attorney fees.

5.        Marsh shall pay $255,000,000 into the Fund on or before June 1, 2005.  Marsh shall pay $255,000,000 into the Fund on or before June 1, 2006. Marsh shall pay $170,000,000 into the Fund on or before June 1, 2007.  Marsh shall pay $170,000,000 into the Fund on or before June 1, 2008.

6.        On November 1, 2005, June 30, 2006, June 30, 2007, and June 30, 2008, Marsh shall pay proportionally to each Participating Policyholder as much of that Participating Policyholder's aggregate share of the Fund as possible with the monies then available in the Fund pursuant to a calculation approved by the Attorney General and the Superintendent.  Within forty-five (45) days of each payment from the fund, Marsh shall file a report with the Attorney General and the Superintendent, certified by an officer of Marsh, listing all amounts paid from the Fund.

## BUSINESS REFORMS

7.        Within sixty (60) days of the effective date of this Agreement, Marsh shall undertake the following business reforms.

### A.  Permissible Forms of Compensation

8.         In connection with its insurance brokerage, agency, producing, consulting and other services in placing, renewing, consulting on or servicing any insurance policy, Marsh shall accept only:  a specific fee to be paid by the client; a specific percentage commission on premium to be paid by the insurer set at the time of purchase, renewal, placement or servicing of the insurance policy; or a combination of both.  Marsh shall accept no such commissions unless, before the binding of any such policy: (a) Marsh in plain, unambiguous written language fully discloses such commissions, in either dollars or percentage amounts; and (b) the client consents in writing.  Nothing in this

paragraph relieves Marsh of complying with additional requirements imposed by law, including the requirements for written documentation relating to fees paid directly by clients.  Marsh may not retain interest earned on premiums collected on behalf of insurers without prior notification to the client, and only when such retention is consistent with the requirements of, and is permitted by, applicable law.

9.          Marsh shall not hereafter, <u>except</u> as set forth in ¶ 8, above, directly or indirectly accept or request any thing of material value from an insurance company including, but not limited to, money, credits, loans, forgiveness of principal or interest, vacations, prizes, gifts or the payment of employee salaries or expenses (hereinafter collectively "Compensation").

### B.  Prohibition of Contingent Compensation

10.          In placing, renewing, consulting on or servicing any insurance policy, Marsh shall not directly or indirectly accept from or request of any insurer any Contingent Compensation.  For purposes of this Agreement, Contingent Compensation is any Compensation contingent upon Marsh's:  a) placing a particular number of policies or dollar value of premium with the insurer, b) achieving a particular level of growth in the number of policies placed or dollar value of premium with the insurer, c) meeting a particular rate of retention or renewal of policies in force with the insurer, d) placing or keeping sufficient insurance business with the insurer to achieve a particular loss ratio or any other measure of profitability, e) providing preferential treatment in the placement process, including but not limited to the giving of last looks, first looks, rights of first refusal, or limiting the number of quotes sought from insurers for insurance placements, or f) obtaining anything else of material value for the insurer.

### C.  Prohibition of "Pay-To-Play" Arrangements

11.        In placing, renewing, consulting on or servicing any insurance policy, Marsh shall not directly or indirectly accept from or request of any insurer any Compensation in connection with Marsh's selection of insurance companies from which to solicit bids for its clients.

### D.  Prohibition of "Bid-Rigging" Arrangements

12.        In placing, renewing, consulting on or servicing any insurance policy, Marsh shall not directly or indirectly knowingly accept from or request of any insurer any false, fictitious, inflated, artificial, "B" or "throw away" quote or indication, or any other quote or indication except for a quote or indication that represents the insurer's best evaluation at the time when the quote or indication is given of the minimum premium the insurer would require to bind the insurance coverage desired by Marsh's client.  Nothing herein shall preclude Marsh from accepting or requesting any bona fide quote or indication.

### E.  Prohibition of Reinsurance Brokerage "Leveraging"

13.        In placing, renewing, consulting on or servicing any insurance policy, Marsh shall not directly or indirectly accept from or request of any insurer any promise or commitment to use any of Marsh's brokerage, agency, producing or consulting services, including reinsurance brokerage, agency or producing services, contingent upon any of the factors listed in ¶ 10 a) -  f), above.

### F.  Prohibition of Inappropriate Use of Wholesalers

14.        In placing, renewing, consulting on or servicing any insurance policy, Marsh shall not directly or indirectly knowingly place, renew, consult on or service its clients' insurance business through a wholesale broker unless agreed to by the client after full disclosure of a) the Compensation

7

received or to be received by Marsh, b) any Marsh interest in or contractual agreement with the wholesaler, and c) any alternatives to using a wholesaler.

### G.  Mandated Disclosures to Clients

15.        Marsh in placing, renewing, consulting on or servicing any insurance policy shall in writing:  a) prior to binding, disclose to each client all quotes and indications sought and all quotes and indications received by Marsh in connection with the coverage of the client's risk with all terms, including but not limited to any Marsh interest in or contractual agreements with any of the prospective insurers, and all Compensation to be received by Marsh for each quote, in dollars if known at that time or as a percent of premium if the dollar amount is not known at that time, from any insurer or third party in connection with the placement, renewal, consultation on or servicing of insurance for that client; b) provide disclosure to each client and obtain written consent in accordance with ¶ 8 of this Agreement for each client, and c) disclose to each client at the end of each year all Compensation received during the preceding year or contemplated to be received from any insurer or third party in connection with the placement, renewal, consultation on or servicing of that client's policy.

### H.  Standards of Conduct and Training

16.        Marsh shall implement company-wide written standards of conduct regarding Compensation from insurers, consistent with the terms of this Agreement, subject to approval of the Superintendent, which implementation shall include, inter alia, appropriate training of relevant employees, including but not limited to training in business ethics, professional obligations, conflicts of interest, anti-trust and trade practices compliance, and record keeping.

8

17.        Marsh shall not place its own financial interest ahead of its clients' interests in determining the best available insurance product or service for its clients.  Marsh shall communicate with its clients in sufficient detail to enable them to make informed choices on insurance products or services, and shall provide complete and accurate information to prospective and current clients on all proposals and bids received from insurers, including the amount of Compensation or other things of value that were or will be paid to Marsh by each insurer.

### J.  Prohibition Against Violating New York Law

18.        Marsh shall not directly or indirectly engage or attempt to engage in violations of Executive Law § 63 (12), the Donnelly Act (Gen. Bus. Law § 340 et seq.), and the Martin Act (Gen. Bus. Law § 352-c).

### K.  Limitation on Extraterritorial Effect

19.        The provisions of  paragraphs 7 through 17 shall apply only to those Marsh entities that (1) service clients domiciled in the United States; (2) place, renew, consult on or provide services for policies covering risks in the Unites States; or (3) are, themselves, domiciled in the United States.

## MONITORING COMPLIANCE AND REPORTING

20.        Marsh shall establish a Compliance Committee of the Board of Directors of Marsh and McLennan Companies, Inc. which shall monitor Marsh's compliance with the standards of conduct regarding Compensation from insurers and shall report on a quarterly basis to the Board of Directors the results of its monitoring activities for a period of five (5) years from the effective date of this Agreement.

21.        Marsh shall maintain a record of all complaints received concerning any Compensation from an insurer which shall be provided to the Compliance Committee of the Board of Directors with the Compliance Committee's quarterly report and to the Superintendent annually commencing from the effective date of this Agreement.

22.         The Board of Directors of Marsh & McLennan Companies, Inc. shall file annual reports with the Superintendent on compliance with the standards of conduct regarding Compensation arrangements for five (5) years commencing in December 2005, which shall also include the amount of each form of Compensation received by Marsh from each insurer with which it placed insurance  during the preceding year.

## COOPERATION WITH THE SUPERINTENDENT

23.        Marsh shall be subject to annual examination by the Superintendent for five (5) years at Marsh's expense beginning in 2005.  Marsh shall fully cooperate with the Superintendent in such examinations.   Marsh shall additionally provide private, secure office space, photocopying equipment and any other administrative or clerical resources necessary to assist in any examination,

10

as well as all relevant data, provided upon request by the Superintendent in electronic or computerized format. The Superintendent may coordinate such examinations with other states.

## COOPERATION WITH THE ATTORNEY GENERAL

24.     Marsh shall fully and promptly cooperate with the Attorney General with regard to his Investigation, and related proceedings and actions, of any other person, corporation or entity, including but not limited to Marsh's current and former employees, concerning the insurance industry.  Marsh shall use its best efforts to ensure that all its officers, directors, employees, and agents also fully and promptly cooperate with the Attorney General in his Investigation and related proceedings and actions.  Cooperation shall include without limitation: (1) production voluntarily and without service of subpoena of any information and all documents or other tangible evidence reasonably requested by the Attorney General, and any compilations or summaries of information or data that the Attorney General reasonably requests be prepared; (2) without the necessity of a subpoena, having Marsh's officers, directors, employees and agents attend any proceedings at which the presence of any such persons is requested by the Attorney General and having such persons answer any and all inquiries that may be put by the Attorney General (or any of the Attorney General's deputies, assistants or agents) to any of them at any proceedings or otherwise ("proceedings" include but are not limited to any meetings, interviews, depositions, hearings, grand jury hearing, trial or other proceedings); (3) fully, fairly and truthfully disclosing all information and producing all records and other evidence in its possession relevant to all inquiries reasonably made by the Attorney General concerning any fraudulent or criminal conduct whatsoever about which it has any knowledge or information; (4) in the event any document is withheld or redacted on grounds

11

of privilege, work-product or other legal doctrine, a statement shall be submitted in writing by Marsh indicating: a) the type of document; b) the date of the document; c) the author and recipient of the document; d) the general subject matter of the document; e) the reason for withholding the document; and f) the Bates number or range of the withheld document.  The Attorney General may challenge such claim in any forum of its choice and may, without limitation, rely on all documents or communications theretofore produced or the contents of which have been described by Marsh, its officers, directors, employees, or agents; and (5) Marsh shall not jeopardize the safety of any investigator or the confidentiality of any aspect of the Attorney General's Investigation, including sharing or disclosing evidence, documents, or other information with others during the course of the investigation, without the consent of the Attorney General.  Nothing herein shall prevent Marsh from providing such evidence to other regulators, or as otherwise required by law.

25.        Marsh shall comply fully with the terms of this Agreement.   If Marsh violates the terms of ¶ 24 in any material respect, as determined solely by the Attorney General: (1) the Attorney General may pursue any action, criminal or civil, against any entity for any crime it has committed, as authorized by law, without limitation; (2) as to any criminal prosecution brought by the Attorney General for violation of law committed within six years prior to the date of this Agreement or for any violation committed on or after the date of this Agreement, Marsh shall waive any claim that such prosecution is time barred on grounds of speedy trial or speedy arraignment or the statute of limitations.

## OTHER PROVISIONS

26.        The Superintendent may take regulatory action to enforce this Agreement.  The

Superintendent may investigate or take regulatory action against any current or former Marsh employee who is licensed by the Superintendent.

27.        Marsh shall not seek or accept, directly or indirectly, indemnification pursuant to any insurance policy, with regard to any or all of the amounts payable pursuant to this Agreement.

28.        The Attorney General will promptly file a Notice Discontinuing Action with Prejudice, in the form attached hereto as Exhibit 3, voluntarily dismissing the Complaint with prejudice, and will not initiate a new case against Marsh related to the matters set forth in the Complaint or uncovered to date by the Attorney General's Investigation.

29.        The Superintendent will promptly discontinue the administrative proceeding commenced by the Amended Citation with prejudice, pursuant to a Stipulation to be executed contemporaneously herewith in the form attached hereto as Exhibit 4, and will not initiate a new administrative proceeding against Marsh related to the matters set forth in the Amended Citation or uncovered to date by the Superintendent's Investigation.

30.        This Agreement is not intended to disqualify Marsh, or any current employees of Marsh, from engaging in any business in New York or in any other jurisdiction.  Nothing in this Agreement shall relieve Marsh's obligations imposed by any applicable state insurance law or regulations or other applicable law.

31.        This Agreement shall not confer any rights upon any persons or entities besides the Attorney General, the Superintendent and Marsh.

32.        Marsh shall maintain custody of, or make arrangements to have maintained, all

13

documents and records of Marsh related to this matter for a period of not less than six (6) years.

33.        The Attorney General of the State of New York may make such application as appropriate to enforce or interpret the provisions of this Agreement, or in the alternative, maintain any action, either civil or criminal, for such other and further relief as the Attorney General may determine is proper and necessary for the enforcement of this Agreement.  If compliance with any aspect of this Agreement proves impracticable, Marsh reserves the right to request that the parties modify the Agreement accordingly.

34.        In any application or in any such action, facsimile transmission of a copy of any papers to current counsel for Marsh shall be good and sufficient service on Marsh unless Marsh designates, in a writing to the Attorney General, another person to receive service by facsimile transmission.

35.        Facsimile transmission of a copy of this Agreement to counsel for each defendant shall be good and sufficient service on Marsh.

36.        This Agreement shall be governed by the laws of the State of New York without regard to conflict of laws principles.

37.        This Agreement may be executed in counterparts.

WHEREFORE, the following signatures are affixed hereto on this 30th day of

January, 2005.


ELIOT SPITZER, ESQ.                    HOWARD MILLS


_____              _____
Attorney General                      Acting Superintendent of Insurance
State of New York                     New York State Insurance Department
120 Broadway, 25th Floor              25 Beaver Street
New York, NY 10271                    New York, NY 10004


DAVIS POLK & WARDWELL


By:     _____
        Robert B. Fiske, Jr. Esq.
        Davis Polk & Wardwell
        450 Lexington Avenue
        New York, NY 10017
        (212) 450-4000

Attorneys for Marsh &
McLennan Companies, Inc.

Attorneys for Marsh Inc.


15

WHEREFORE, the following signatures are affixed hereto on this 30th day of January, 2005.


ELIOT SPITZER, ESQ.                           HOWARD MILLS


_____                     _____
Attorney General                              Acting Superintendent of Insurance
State of New York                             New York State Insurance Department
120 Broadway, 25th Floor                      25 Beaver Street
New York, NY 10271                            New York, NY 10004


DAVIS POLK & WARDWELL


By:    _____
       Robert B. Fiske, Jr. Esq.
       Davis Polk & Wardwell
       450 Lexington Avenue
       New York, NY 10017
       (212) 450-4000

Attorneys for Marsh &
McLennan Companies, Inc.

Attorneys for Marsh Inc.


15

WHEREFORE, the following signatures are affixed hereto on this 30th day of

January, 2005.


ELIOT SPITZER, ESQ.                    HOWARD MILLS


_____        _____
Attorney General                        Acting Superintendent of Insurance
State of New York                       New York State Insurance Department
120 Broadway, 25th Floor                25 Beaver Street
New York, NY 10271                      New York, NY 10004


DAVIS POLK & WARDWELL

By:    _____
       Robert B. Fiske, Jr. Esq.
       Davis Polk & Wardwell
       450 Lexington Avenue
       New York, NY 10017
       (212) 450-4000

Attorneys for Marsh &
McLennan Companies, Inc.

Attorneys for Marsh Inc.


15

EXHIBIT 1

"MARSH INC. WOULD LIKE TO TAKE THIS OPPORTUNITY TO APOLOGIZE FOR THE CONDUCT THAT

LED TO THE ACTIONS FILED BY THE NEW YORK STATE ATTORNEY GENERAL AND

SUPERINTENDENT OF INSURANCE.  THE RECENT ADMISSIONS BY FORMER EMPLOYEES OF

MARSH AND OTHER COMPANIES HAVE MADE CLEAR THAT CERTAIN MARSH EMPLOYEES

UNLAWFULLY DECEIVED THEIR CUSTOMERS.  SUCH CONDUCT WAS SHAMEFUL, AT ODDS WITH

MARSH'S STATED POLICIES AND CONTRARY TO THE VALUES OF MARSH'S TENS OF THOUSANDS

OF OTHER EMPLOYEES.


IN RESPONSE, WE HAVE TAKEN PROMPT, CORRECTIVE ACTION AND IMPLEMENTED A SERIES OF

BUSINESS AND CORPORATE GOVERNANCE REFORMS.  THE EMPLOYEES OF MARSH INC. ASK OUR

CLIENTS AND OTHERS TO ALLOW US THE OPPORTUNITY TO REGAIN THEIR TRUST."

EXHIBIT 2

**GENERAL RELEASE**

This RELEASE (the "Release") is executed this ___ day of _____, 2005 by RELEASOR (defined below) in favor of RELEASEE (defined below).

**DEFINITIONS**

"RELEASOR" refers to **[fill in name _____]** and any of its affiliates, subsidiaries, associates, general or limited partners or partnerships, predecessors, successors, or assigns, including, without limitation, any of their respective present or former officers, directors, trustees, employees, agents, attorneys, representatives and shareholders, affiliates, associates, general or limited partners or partnerships, heirs, executors, administrators, predecessors, successors, assigns or insurers acting on behalf of RELEASOR.

"RELEASEE" refers to Marsh & McLennan Companies, Inc. and any of its subsidiaries, affiliates, associates, general or limited partners or partnerships, predecessors, successors, or assigns, including, without limitation, any of their respective present or former officers, directors, trustees, employees, agents, attorneys, representatives and shareholders, affiliates, associates, general or limited partners or partnerships, heirs, executors, administrators, predecessors, successors, assigns or insurers (collectively, "Marsh").

"AGREEMENT" refers to a certain agreement between Marsh and the Attorney General of the State of New York ("NYAG") and the Superintendent of Insurance of the State of New York ("NYSI") dated February ___, 2005, relating to an action commenced against Marsh  by NYAG dated October 14, 2004 captioned The People of the State of New York against Marsh & McLennan Companies, Inc. and Marsh Inc., Index No. 04/403342, and an investigation by NYAG relating to same (the "Complaint"), and a Citation and Amended Citation captioned In the Matter of Marsh & McLennan Companies, Inc. et. al., (Amended Citation No. 2004-0123-C), issued to Marsh by NYSI on October 21, 2004 and October 25, 2004, respectively, and an investigation by NYSI relating to same (collectively, the "Amended Citation").

**RELEASE**

1.      In consideration for the total payment of $_____ in accordance with the terms of the Agreement, RELEASOR does hereby fully release, waive and forever discharge RELEASEE from any and all claims, demands, debts, rights, causes of action or liabilities whatsoever, including known and unknown claims, now existing or hereafter arising, in law, equity or otherwise, whether under state, federal or foreign statutory or common law, and whether possessed or asserted directly, indirectly, derivatively, representatively or in any other capacity (collectively, "claims"), to the extent any such claims are based upon, arise out of or relate to, in whole or in part, any of the allegations, acts, omissions, transactions, events, types of conduct or matters that are the subject of the Complaint, the Amended Citation, except for claims which are based upon, arise out of or relate to the purchase or sale of Marsh securities.

2.      In the event that the total payment referred to in paragraph 1 is not made for any reason, then this RELEASE shall be deemed null and void, provided that any payments received by RELEASOR shall be credited to Marsh in connection with any claims that RELEASOR may assert against Marsh, or that are asserted on behalf of RELEASOR or by a class of which RELEASOR is a member, against Marsh.

3.      This RELEASE may not be changed orally and shall be governed by and interpreted in accordance with the internal laws of the State of New York, without giving effect to choice of law principles, except to the extent that federal law requires that federal law governs.  Any disputes arising out of or related to this RELEASE shall be

17

subject to the exclusive jurisdiction of the Supreme Court of the State of New York or, to the extent federal jurisdiction exists, the United States District Court for the Southern District of New York.

4.      Releasor represents and warrants that the claims have not been sold, assigned or hypothecated in whole or in part.


Dated: _____


RELEASOR: _____


By: _____


Print Name: _____


Title: _____

EXHIBIT 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

THE PEOPLE OF THE STATE OF NEW YORK    :
by ELIOT SPITZER, Attorney General of      :
the State of New York,                          :
                                             :
Plaintiff,                               :          Index No. 04/403342
                                             :
                                         :            NOTICE
                                                 DISCONTINUING
– against –                         :    ACTION WITH PREJUDICE
MARSH & McLENNAN COMPANIES, INC.     :
and MARSH INC.,                          :
                                         :
Defendants.                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

       PLEASE TAKE NOTICE that, pursuant to CPLR § 3217(a) and the agreement annexed

hereto, plaintiff hereby discontinues this action with prejudice as of this date without costs to

either party against the other.

Dated:  New York, New York

      [date]

                              ELIOT SPITZER,
                              Attorney General of the State of New York


                            By:   _____
                                    David D. Brown, IV
                                    Assistant Attorney General
                                    120 Broadway
                                    New York, NY 10271
                                    (212) 416-8198

19

Attorney for Plaintiff

To:    Marsh & McLennan Companies, Inc.
       1166 Avenue of the Americas
       New York, New York 10036.

       Marsh Inc.
       1166 Avenue of the Americas
       New York, New York 10036.

WHEREFORE, the following signatures are affixed hereto this _____ day of January, 2005.

Marsh & McLennan Companies, Inc.

By: _____

Marsh Inc.

By: _____

Eliot Spitzer, Attorney General
of the State of New York

By: _____

20

EXHIBIT 4



STATE OF NEW YORK
INSURANCE DEPARTMENT
25 BEAVER STREET
NEW YORK, NEW YORK  10004

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

        In the Matter of

**MARSH & McLENNAN COMPANIES, INC.,**
**MARSH, INC., MARSH PLACEMENT INC.**
**(formerly known as Marsh Global Broking**
**Inc.), MARSH USA INC., MARSH USA (ALASKA),**          **STIPULATION**
**MARSH USA (CONNECTICUT), MARSH USA**          No. 2004-0123-C
**(MASSACHUSETTS), MARSH USA (MICHIGAN),**
**MARSH USA (NEVADA), MARSH USA (OHIO),**
**MARSH USA (PENNSYLVANIA), MARSH USA**
**(TEXAS), MARSH USA (UTAH),  MARSH**
**INSURANCE AGENCY & INVESTMENTS and**
**SEABURY & SMITH INC.,**

                                Respondents.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

        WHEREAS,  Marsh Placement Inc. (formerly known as Marsh Global Broking Inc.) is licensed as a broker under Section 2104 of the New York Insurance Law ("Insurance Law") and as an excess line broker under Section 2105 of the Insurance Law; Marsh USA Inc. is licensed as a broker under Section 2104 of the Insurance Law, as an excess line broker under Section 2105 of the Insurance Law and as an agent under Section 2103(b) of the Insurance Law; Marsh USA (Alaska) is licensed as an agent under Section 2103(b) of the Insurance Law; Marsh USA (Connecticut) is licensed as a broker under Section 2104 of the Insurance Law, as an excess line broker under Section 2105 of the Insurance Law and as an agent under Section 2103(a) of the Insurance Law; Marsh USA (Massachusetts) is licensed as a broker under Section 2104 of the Insurance Law and as an agent under Section 2103(a) of the Insurance Law; Marsh USA (Michigan) is licensed as a broker under Section 2104 of the Insurance Law and as an agent under Section 2103(a) of the Insurance Law; Marsh USA (Nevada) is licensed as a broker under Section 2104 of the Insurance Law; Marsh USA (Ohio) is licensed as an agent under Section 2103(b) of the Insurance Law; Marsh USA (Pennsylvania) is licensed as a broker under Section 2104 of the Insurance Law, as an excess line broker under Section 2105 of the Insurance Law, as an agent under Section 2103 (a) and (b) of the Insurance Law, and as a life broker under Section 2104(b)(1)(A) of the Insurance Law; Marsh USA (Utah) is licensed as a broker under Section 2104 of the Insurance Law; Marsh USA (Texas) is licensed as an agent under Section 2103(b) of the Insurance Law; Marsh Insurance Agency & Investments is licensed as an agent under Section 2103(a) of the Insurance Law; Seabury & Smith Inc. is licensed as a broker under Section 2104 of

21

In the Matter of Marsh & McLennan Companies, Inc., *et al.*                    Page 22

the Insurance Law, as an excess line broker under Section 2105 of the Insurance Law, as an agent under Section 2103(a) and (b) of the Insurance Law, and as an independent adjuster under Section 2108 of the Insurance Law; and Marsh Inc. is a Delaware corporation with its principal place of business in the State of New York; and

WHEREAS, all of the foregoing Respondents are wholly owned subsidiaries of Respondent Marsh & McLennan Companies, Inc., which is a Delaware corporation with its principal place of business in the State of New York; and

WHEREAS, on or about October 14, 2004, the Attorney General of the State of New York commenced a civil action in the Supreme Court of the State of New York, County of New York, *The People of the State of New York v. Marsh & McLennan Companies, Inc., et al.*, Index No. 04-403342 (the "Civil Action"), charging Respondents Marsh & McLennan Companies, Inc. and Marsh Inc. with fraudulent and anti-competitive practices in connection with the brokering of insurance business in violation of the New York Executive Law, the General Business Law and common law; and

WHEREAS, the Civil Action has been resolved pursuant to an Agreement Between the Attorney General of the State of New York, the Superintendent of Insurance and Marsh & McLennan Companies, Inc. and Marsh Inc., dated January 30, 2005 ("Settlement Agreement"), a copy of which is annexed hereto; and

WHEREAS, the attached Amended Citation, dated October 25, 2004, charging the Respondents with having used fraudulent, coercive and/or dishonest practices, having demonstrated untrustworthiness, violating Section 340 of the General Business Law, and having engaged in determined violations of the Insurance Law, was duly served on the Respondents; and

WHEREAS, Respondents have been advised and are aware of their statutory right to notice and a hearing on said charges; and

WHEREAS, Respondents desire to resolve said charges by entering into a Stipulation on the terms and conditions hereinafter set forth in lieu of proceeding with a hearing in this matter; NOW THEREFORE,

IT IS HEREBY STIPULATED AND AGREED by and between the Respondents and the New York State Insurance Department ("Department"), subject to the approval of the Superintendent of Insurance, as follows:

1.      Respondents waive their right to further notice and hearing in this matter, and agree to fully comply with all of the terms and conditions of the Settlement Agreement.

2.      Respondents agree to cooperate fully in all Department examinations of Respondents and in all Department investigations of current or former employees of Respondents or licensees of the Department.

3.      Respondents acknowledge that this Stipulation may be used against them in any future Department proceeding if there is reason to believe the terms of the Settlement Agreement or this Stipulation have been violated by Respondents, or if the Department institutes disciplinary action against any Respondent for any reason other than the acts considered herein.

4.      The proceeding initiated by the attached Amended Citation is hereby resolved and discontinued by the Department.

22

In the Matter of Marsh & McLennan Companies, Inc., *et al.*                    Page 23

Dated:  New York, NY
              January    , 2005

NEW YORK STATE INSURANCE DEPARTMENT


By:     _____
                                Jon G. Rothblatt
                                Principal Attorney


MARSH & McLENNAN COMPANIES, INC.,
MARSH, INC., MARSH PLACEMENT INC.
(formerly known as Marsh Global Broking
Inc.), MARSH USA INC., MARSH USA (ALASKA),
MARSH USA (CONNECTICUT), MARSH USA
(MASSACHUSETTS), MARSH USA (MICHIGAN),
MARSH USA (NEVADA), MARSH USA (OHIO),
MARSH USA (PENNSYLVANIA), MARSH USA
(TEXAS), MARSH USA (UTAH),  MARSH
INSURANCE AGENCY & INVESTMENTS and
SEABURY & SMITH INC.,


By:     _____
          Name:
          Title:


STATE OF NEW YORK            )
                                         )ss.:
COUNTY OF                        )

              On this          day of January, 2005, before me personally came

                                                , to me known, who, being by me duly sworn, did depose
and say that he/she resides at
                                          ; that he/she is the                                                     of
Marsh & McLennan Companies Inc., the corporation described in and which executed the above instrument

23

In the Matter of Marsh & McLennan Companies, Inc., *et al.*                    Page 24

on behalf of each of the entities listed above; and that he/she signed his/her name thereto by order of the board of directors of said corporation.

_____
Notary Public

THE FOREGOING STIPULATION IS HEREBY APPROVED.

Dated:          New York, NY
                January          , 2005

                                        HOWARD MILLS
                                        Acting Superintendent of Insurance

                By:   _____
                                        Audrey Samers
                                        Deputy Superintendent & General Counsel

24